Good morning. Welcome to the United States Court of Appeals for the Sixth Circuit. Please call our first case. Case No. 12-4056 and 12-4060, United States of America v. Michael Lombardo and Steven Barkus. Oral arguments will be ten minutes for each defendant and twenty minutes for the plaintiff. Mr. Belli for the appellate. And if you've reserved time for rebuttal, please tell me what that is. May it please the Court, my name is Dennis Belli and I represent Steven Barkus in this appeal. I wish to reserve one minute of rebuttal time. Mr. Barkus appeals his convictions for conspiracy to commit mail and wire fraud and conspiracy to defraud the government and related substantive offenses. Mid last century, Judge Learned Hand made the remark in an appellate case from the Second Circuit that a bare denial is never impressive from the mouth of the accused. And what Judge Hand was getting at is that a defendant has as much right under the Constitution and basic principles of fairness to develop his case as does the government. Under issues four and five of our brief, we've challenged the fairness of Mr. Barkus' trial, both from the respect of the district judge's rulings during direct examination when Mr. Barkus took the witness stand as well as the ineffective assistance of his own attorney. Now normally this court is reluctant to address ineffective assistance claims in a direct appeal. However, in a recent case, United States v. Washington, the court agreed to hear such a claim similar to the one made here that the defendant was denied his right to effective assistance because of defense counsel's failure to call defense witnesses. In this case, Mr. Barkus had numerous witnesses. He tells me 49 witnesses that he desired to call to support his defense that he was trying in good faith to negotiate the sales of multiple businesses in order to satisfy his loans to his lenders and also his good faith belief that he did not owe the government tax money. You've got a lot of issues. Are the two that you just mentioned, IAC and I've already forgotten the first one, are they the two that you want to concentrate on this morning? No, I just wanted to touch on that. Would the court prefer that I move? It would help, at least in my respect, if you could tell us what is the issue you really want to concentrate on today? Actually, the primary issues I'd like to concentrate on are this question of venue. This also relates to the government's use of these plea documents of Mr. Helfgott, an alleged co-conspirator, and also the structuring of the indictment. The government's theory of venue in this case was that Stephen Helfgott, a now disbarred attorney with a practice in Cleveland, Ohio, was part of the conspiracy. If you remove Mr. Helfgott from the picture, you have alleged multiple victims, none of whom resided in Ohio. You have defendants that resided in California. If you remove Helfgott, I would assume there may well be a venue problem, but if the jury was reasonable in connecting Helfgott to the conspiracy, then he clearly acted in Ohio, so what's the problem? Well, the problem is basically this, that Mr. Helfgott was not guilty of any crime. He had pleaded guilty himself, didn't he? That's correct, and I know, Judge, you're thinking, well, if he pled guilty, maybe he's guilty, but he had already been implicated in an entirely unrelated crime. He knew that he was going down for a period of time in prison, and the charges in this case were just kind of a freebie. It made no difference in his sentence, and the concern here is that when this court's case law states that the government can elicit basic information regarding a cooperating individual's plea agreement with the government in order to take the sting out of the defense getting up there and saying, aha, you haven't told this jury that you struck a deal with the government and are hoping for leniency. That's the extent to which the government can do that, but that's not what occurred here. The government used these plea documents, that's the information, the plea agreement, and the judgment of conviction as substantive proof that Mr. Helfgott was guilty of the crime of conspiracy to defraud the government, and that's where we have a problem. What's your support for saying that it was used as substantive proof? The fact that the entire information, and this was a very detailed information that tracked the tax conspiracy count of the defendant's indictment word for word, that was introduced, given to the jury, and Mr. Helfgott was questioned about all the, he was asked, did you read all these overt acts and disinformation? Are they true? And then the plea agreement, and I've never seen a plea agreement like this, at least we don't do it in the Southern District of Ohio, where all the stipulated facts are set forth verbatim in the plea agreement. Okay, but he said that they were true, right? That's true, and that's the way the government started out the direct examination. But it was his testimony that said it was true. He was on the stand, right? Yes, and we submit that that is inappropriate because the government, rather than starting out saying, okay, what happened? The government started out having him. But the government could have simply said, did you do this? The government could have read each allegation from a separate piece of paper and asked if he did all those things, and he says yes, and so you have venue, don't you? No, because actually when you get to the meat of Mr. Helfgott's testimony, where he was unaided by these documents, he basically denied involvement in the crime. He said that he was directed to make certain transactions through his lawyer's trust account, but one week, I think it was a week or ten days before trial, he told an agent that he didn't know about the tax liens until afterwards, after 2006. Then you, in this district, in Northern District of Ohio, you just have to show one overt act of a conspiracy. I mean, you can get conspirators from clear over Dubai or Russia if they have one overt act in Ohio, right? That's true, and the government's position was that Mr. Helfgott committed this overt act, and we submit that if you look at his testimony, putting aside the plea documents, he never admitted to committing any crime. He said that he was unaware of a tax issue or a tax lien until 2006, and I think this was before the last loan was made, but he never said that he's the one that proposed using his lawyer's trust account in this manner, and he never said that his purpose in doing so was to assist the defendants in evading taxes. The whole predicate of your claim here, then, is omit whatever's in the plea document. Our case law is, I thought, clear that the government is entitled to put in the terms of the plea, and they're also entitled to put in the entirety of the plea agreement so that they're not accused of only showing the jury selected portions of that. So while theoretically, I suppose you might be correct, that what he said absent the plea agreement may or may not have been sufficient, we still have to focus in on what was wrong with what they did with the plea agreement here. It seems to be in accordance with our case law. Judge McKee, if you look at your prior cases such as Thornton, the only thing that this court has said that the government can do is put before the jury the nature of the crime that the cooperator pled guilty to, any promises of leniency that were extended to him, and his ultimate sentence, but not to give the jury to take back in deliberations basically a script of the government's case. These documents were used as a... So is the allegation or is the claim here, then, that you can't show the jury the plea agreement at all, or that there was something unique or unusual about this plea agreement that means that it's outside of the case law that we have? That would be the latter. I think you summarized what I'm trying to get at very succinctly, Judge. And it may well be that this is unusual, as you alluded to earlier, but is there any case law that suggests that the trial judge is supposed to parse the plea agreement to say, well, this one's okay to show to the jury, but this one's not okay to say to the jury because it contains X, Y, Z? Well, I think you have general case law that says that the line is crossed when plea documents are used as substantive evidence of the guilt of the person who is on trial. Isn't it different when... Okay, isn't it different when you have the witness on the stand and you're actually asking about each of the allegations in the plea agreement and you have an independent admission of those facts? And, Your Honor, we would submit that that's entirely improper. A cooperating witness is like any other witness. You just ask the witness unscripted questions and the government calling the witness is stuck with the answers. But to start out saying, okay, let's go through all these overt acts that you pled guilty to. Don't try to wiggle out of them now. Aren't these true? And then the jury knows that a district judge accepted the plea agreement, entered a judgment of conviction. That's where the line is crossed. It lends to the jury. The jury is being told that another branch of the court accepted this plea, made findings that these were the facts and that this cooperator is bound by those facts and that they can apply that information rather than what the witness is actually saying in trial. I think we get the argument. And you're claiming that runs afoul of Thornton. Yes, we do. All right. Fair enough. Thank you. I'd like to ask you about exactly what evidence you couldn't get in and, more important, why that was crucial and not cumulative, not harmless. This goes back to my initial issues. Yes. Basically, Mr. Barkas took the witness stand and said, I didn't have a criminal intent. I'm not guilty. And then when he tried to get in testimony regarding what tax and accounting professionals told him, that was excluded, allegedly hearsay. He said that he was trying to sell these businesses to generate funds to pay off his lenders, but it was just basically his word. But he had witnesses lined up to say, yeah, you know, he was negotiating with us and we thought that one of these businesses in particular was viable and we were trying to arrange a sale. You know, the government calls. I don't know how many witnesses they called. I would imagine 35, 40, maybe more witnesses. And the jury's impressed with all this. And then here's one man who takes the witness stand and says, oh, I'm not guilty. I mean, that's proper testimony of those witnesses. Yes. In the motion for a new trial, Mr. Barkas signed a multiple-page declaration of what he intended to accomplish with these witnesses. Did he do that during the trial when he asked to put in this evidence when it was excluded because of hearsay? Did he say, I've got Mr. Jones here who's going to testify that he told me this was all legal? Did he do that proper at the time? No, he didn't, Judge. And that's part of our ineffective assistance. The criminal rule is clear that even someone with retained counsel can ask the court for funds to bring in the witnesses, and defense counsel did nothing. He said, oh, I'm counting on the attorney for the co-defendant, who was an appointed attorney, to do all the legwork in bringing in these witnesses using his entitlement to CJA funds to bring them in, and I don't have to do anything. And what does the record show as to the reasons for the attorney's actions? Nothing. Incompetence. The district judge basically – That's your view of it. No, that's the district judge's view. She said, I'm denying this motion for a new trial because defense counsel did nothing during the trial to alert me to the fact that this was a problem, that this is what he wanted to accomplish. The point is we don't know why the lawyer did that, which is why we reserve ineffective assistance to a subsequent proceeding. You can say there could not possibly be any conceivable, strategical reason why the lawyer did that. You can make that claim. But the attorney himself said that he wanted to call the witnesses. We know that for a fact, and he said the only reason why I didn't call him was because I was counting on the attorney for the co-defendant to call them. It's not that he said, oh, I had a change of mind or maybe these witnesses wouldn't help. He's saying I wanted to call these witnesses but wasn't able to. Were they on the witness list, all of these witnesses? Yeah, I believe that witness lists were filed by both parties, and they are in the PACER. First of all, let's be clear that there are two different things. One is the inability to testify to what someone said because of hearsay. Correct. The other is not being able to put that person on the stand. That's true. And then there's also the question of whether it was hearsay. Right. It would be hearsay if offered for the proof of the matter asserted but not to show the effect on the defendant. And when you have this admissible for one purpose but not admissible for another purpose, it's admissible with a limiting. Okay, and did counsel make that argument? He didn't, but I would submit that. I'm not 100% sure of that, but I would submit that by asking the questions, the government objects, the court rules. I mean, he did make, there were some sidebars, and we submit that once the court rules, defense counsel has done all that he's required. I think one of the court's response is that what he did after doesn't matter, it's what he did initially that matters. Yes, but a lot of these hearsay statements were contemporaneous during the course of events. We're talking about 2000 to 2006, so a lot of the information was contemporaneous. I think what you're talking about, Judge White, is that the defendant wanted to put in information or testimony regarding attempts to contact a U.S. attorney's office before the indictment, and I think there were two extensions of the limitations period, sit down with the investigators and the U.S. attorneys and give a presentation of why the defendant is not guilty. One other question. It's your client's intent when he took the money that's important, right? That's true. Okay. And you're talking about evidence that he wanted to pay it back. Now, did the prosecutor use evidence of his subsequent conduct as evidence of guilt? Not per se, but the defendant's conduct throughout the entire continuum reflects his state of mind, what he does subsequent. If he's trying hard to pay back his lenders, that tends to show that he thought that these were legitimate loans, that he intended to repay them at the time that the loans were made. I think in one of the Supreme Court cases, they called this the power of the narrative, the ability to tell the whole story, and when you have what Justice Souter called a narrative gap, it hurts the party because the jury needs to hear the whole story. Thank you for your intelligence. All right. You've taken about twice as much time as the time allotted, so we'll give you a little bit extra time if you need it, and then if you need more time because we went longer, then just let me know. Good morning. May it please the Court. My name is Amy Lee Copeland. I represent Appellant Michael Lombardo. This morning I reserved three minutes for rebuttal, Judge McKee. My client has a more fundamental problem. He just didn't enter into an agreement to do any illegal activity. I'm going to focus mostly on counts one and count six, and counts one and six in combination this morning, but, of course, can answer questions about any other count that you might have. Count one is pretty interesting. At page 29 of the government's brief, it says, Although Barkas was the primary face of the conspiracy for many victims, there were many specific instances where Lombardo personally solicited the victim's investment money. But as did Lombardo, the government cites only three victims. There were about 25 victims called as witnesses at trial. Three discussed Lombardo. The first involves a face-to-face meeting between David Prince and Mr. Lombardo in May of 2005. This was arranged by Barkas at the time. Mr. Prince said he and Barkas were best friends. And Barkas told Mr. Prince that Lombardo needed a $10,000 loan because Lombardo was down on his luck. The government notes that the loan remained unpaid. Mr. Lombardo had a stroke two months after obtaining this loan from Mr. Prince and filed bankruptcy shortly after that to deal with his medical bills. This is one of the instances. This is entirely consistent with Mr. Lombardo's belief as expressed in Mr. Barkas. Mr. Barkas told him all the money that he was receiving through Health Cots Iota came from Mr. Barkas's family and friends, and Mr. Prince certainly considered himself a close personal friend of Mr. Barkas. The second victim who identified Mr. Lombardo was a man named Victor Rothgarn, and this came up with the R.S. Soothe LLC. Mr. Lombardo suffers from terrible psoriasis. R.S. Soothe came up with a coal-based formula to ease the itching and alleviate the pain. Mr. Rothgarn had seen the product, had seen the website, had a sister, I believe, who found it very helpful, wrote a check that said investment, and eventually was scratched out and placed a loan on it. And interestingly, despite the fact that somebody recharacterized this as a loan, Mr. Rothgarn got ownership documents within R.S. Soothe LLC. At pages 127 to 129 of the second volume of his deposition, he says that Mr. Lombardo didn't ask him to do anything that was illegal or unethical, that this was just an investment and a bad business decision on his part, and he also acknowledged that he received documents reflecting his ownership in R.S. Soothe. Well, the theory here by the prosecution was this was a sort of a Ponzi scheme, right? That was their theory. After Rothgarn put money in, he didn't get anything back, and they kept telling him, oh, they're going to send him money here, there and everywhere. He didn't get a thing, did he? Judge, I believe Mr. Rothgarn got $20,000 back. I know, but that's kind of a pittance for what he said. I believe he was in for about $90,000. But his discussions, while he did have some contact with Mr. Lombardo, I believe my recollection is most of his discussions were with Mr. Barkas. What happened with the company? With R.S. Soothe? I mean, he got the money. He put it into the IOLTA account, right? Yes, Your Honor. Okay. And then both of the defendants had bills paid from that, personal bills, et cetera. Did that money go to pursue this new venture? It certainly did, Your Honor. The testimony is replete that Mr. Lombardo actively marketed R.S. Soothe to various psoriasis conferences to market the product. Used it. There were psoriasis sufferers who testified at trial that R.S. Soothe was a miracle product. That's an answer to a different question, is it? It may very well be, Judge. He may well have been out trying to promote a product, but whatever happened in connection with producing the product? Was the money put into manufacturing facilities or buying the ingredients or having them prepared by somebody else? Your Honor, there was testimony of this, that there were pallets of R.S. Soothe that were placed out at a warehouse distribution facility. There was also testimony that the inventor of R.S. Soothe, Mr. Harry Berg, believed that it had been priced too high, and that explained why it didn't sell. So there were actual products that were placed out, and, again, Mr. Lombardo did fly out and actively promote the product. So if this was intended not to be a real corporation, nobody told my client. I mean, he went places. He did stuff. He marketed it. It was a direct mail sort of situation. People testified that it worked. In fact, the third investor that the government identified, Dr. Phyllis Presley, testified that it was a very effective product. That's why she personally recommended it. Didn't consider herself a victim. Just felt like she maybe had made a bad business decision in this, that she believed in the product and she believed in the company, and it simply did not peter out for her. In terms of what Mr. Lombardo had been told by Mr. Barkas, too, that the money came from family and friends, this is certainly consistent with everything we know about Mr. Barkas from the trial transcript. He testified in his own testimony at pages 4610 to 4613 that $170,000 for Timber Top, LLC, the mining and timber operation in Northern California, came from his mother at pages 58 to 39. Fifty percent of the airplane that went into Smooth Flyer, LLC, or $30,000, also came from his mother. So that's $200,000 into the kitty, if you will, that came from Barkas' family. Barkas had the trappings of wealth. He drove a Jaguar. He had a house on Beacon Hill. It was a neighbor in the same neighborhood. Are you saying that he defrauded his mother, too? Judge, I'm saying that he, you know, I don't know what he's telling his mama during all this, Judge, but I know what he's telling her. A lot of money, and it didn't seem to pay any investors back much except this little bit for Rothgard and a few others. Yeah, and all I can speak to is what Mr. Barkas is telling Mr. Lombardo, and by his own testimony he's telling Mr. Lombardo that this money came from family and friends. And this is also consistent with the relationship between Mr. Barkas and Mr. Helfgott, too. Helfgott said he took marching orders from Mr. Barkas. As I put in his brief, his testimony is a little all over the place about what he did and who he heard from, but the underlying gist of it seems to be that Mr. Barkas called the shots with Mr. Helfgott. I'm sorry. Your theory was that Mr. Lombardo was just a lucky guy to have a very generous friend. Your Honor, they had known each other for a very long period of time. I don't know why Mr. Barkas felt compelled to help Mr. Lombardo. Mr. Lombardo had a ninth-grade education, had a series of strokes, was sick, and was told by Mr. Barkas that he was being provided money to help him out because Mr. Barkas had a rich family and rich friends, and he's giving it to Mr. Lombardo. And when Mr. Lombardo told the attorney to distribute funds in certain ways, that was what just... Mr. Lombardo didn't tell Mr. Helfgott to distribute funds. Mr. Barkas did. Mr. Lombardo just received the money from these distributions. I thought the record reflected that at least on some occasions Lombardo was involved in taking the money out of the account. Your Honor, there is a site that the government makes. I think it's to the page ID number 7017. I have read that repeatedly, and it just says that there was a distribution directed to Mr. Lombardo. It does not say that Mr. Lombardo directed that, and I'm sure the trial attorney here will be happy to clarify that if I'm wrong. But I read that page repeatedly because I've been curious too exactly who Helfgott got marching orders from, but everything that I saw was that he was taking them from Mr. Barkas and not Mr. Lombardo. Additionally, the tax count suspect too, the conspiracy to evade taxes, because Mr. Helfgott is very clear that for the most part he doesn't know that there's any tax obligation due in Owen. I believe that he finally said that, well, in 2005 he found out there was some sort of tax issue, and that he never knew whether Mr. Lombardo had a tax issue. He simply assumed, because the two men were partners, that there was a tax obligation flowing to Mr. Lombardo too. Again, the government relies on... In the final analysis, why does it matter whether he knew there was a lien, and if so, whether there was also a Lombardo lien? It at least appears as if they're essentially laundering money through this account in ways that, as far as I know, attorneys just don't do. So is it Lombardo's position he just thought the use of this IOTA account was just simply normal business practices by a lawyer? Your Honor, Mr. Lombardo and I have not had that conversation, and it does not appear in the record. I will tell you this, Mr. Lombardo has a ninth-grade education, apparently has always looked up to Mr. Barkas, whom he viewed as a much more sophisticated man than he... Mr. Barkas, I believe, has a degree from... Because you have a ninth-grade education, you can take in a million dollars and not file tax returns and not pay taxes? Well, where it goes to getting back then to your tax question here is that there's a string of cases, including Pritchett out of the Eleventh Circuit, Ingram from the Supreme Court, that talks about in a conspiracy to evade taxes, you have to have knowledge that that's the goal of the conspiracy. And here, if Mr. Helfgott doesn't have that knowledge, he just thinks, he testified, that he is doing this because Mr. Barkas needed to shield money from creditors or because he needed to arrange his expenses while he was out traveling. There's no discussion about whether this is a scheme to defraud the IRS. So, Mr. Helfgott and Mr. Barkas, there's no real agreement there to defraud the service, which is required by the case law that I've cited in my brief. And then finally, troubled by account six, whether you deem it variance, as the trial attorney did, or as Mr. Barkas's attorney did, the overt acts of count six, which is the tax evasion conspiracy, specifically incorporate, by reference, the overt acts in count one. Just to give you an example, if you look at page nine of the superseding indictment, overt act 24, it talks about Helfgott approaching a friend who was an attorney in Cleveland to contact a friend and classmate who was a businessman in Louisiana so that Helfgott could arrange to present an investment offering concerning a purported construction development in Indonesia. Based upon the incorporation, by reference, into count six, which is a tax evasion conspiracy, that overt act alone could have been the overt act that the jury found Mr. Lombardo guilty of conspiracy to commit tax evasion. It's a bad way to draft an indictment. Did the jury have the indictment? They did, Your Honor. The judge read it, actually, read the indictment. Right, but did the jury also have it in the jury room? Your Honor, I think so, but I'm not certain. I apologize for that. But I do know that the judge read it word for word during the jury instructions. If you all have any more questions, I'd be happy to answer them at this time, sure. All right. Thank you, counsel. Thank you. Good morning. May it please the court. My name is Robert Patton, arguing on behalf of the United States of America. May it please the court. The jury's verdict and the judge's ruling should be affirmed in this case. I know in response to some of the questions asked by the panel this morning, I would like to focus in on some of the hot-button issues that the court has raised. I know that when Mr. Belli spoke, there was a lot of questions regarding Mr. Helfgott and his knowledge of the conspiracy and when he acquired knowledge. I would respectfully cite the court to the record 329, page ID 7442 through 7444. In those pages, the court will see that Mr. Helfgott testified on redirect examination that he was aware of the tax issues with both defendants since at least 2005. I know it was stated before 2006. That is inaccurate. He was aware of it in 2005. Further, Judge Seiler mentioned that all you need is one overt act after that time to pull Mr. Helfgott into the conspiracy. I would respectfully cite the court to the testimony of Joan LeCount. She sent a check to Mr. Helfgott in the Northern District of Ohio in May of 2006. So with respect to the issue of venue, it's the government's position that that would satisfy the concerns that were raised during the questioning. With respect to the sufficiency of evidence to sustain the convictions, there was discussion regarding Defendant Sparkett's motion for a judgment of acquittal. As this court is aware, under U.S. v. Fisher, such an agreement between co-defendants does not need to be formal. A tacit understanding or mutual understanding of the parties is sufficient. The record is replete with Mr. Helfgott's testimony. That's separate and apart from his plea agreement, which I'll discuss in a few moments. He received specific wiring instructions from Mr. Barkas. He was aware that PCF was a corporate account from a defunct corporation that was used by both defendants. He was directed, that is Mr. Helfgott, was directed to disperse money from the IOLTA account specifically to pay Defendant Barkas's personal expenses, to pay Lombardo's personal expenses, and to move money to the PCF account from the IOLTA account. Ms. Copeland can't find any testimony where Lombardo directed Helfgott to make disbursements. Is there any? Your Honor, I know in the government's brief there is a cite to the page ID 7017. The government would rely on that. I will tell the court that as trial counsel there are numerous instances where money is sent to Defendant Lombardo either directly or through the PCF account. I'll further state it's noted in the government's brief, and I apologize I don't have the cite for the court, but there was also a transfer of money to the CalFed account, which I recall was a Lombardo account that's mentioned in the government's brief. But you don't have any? The question wasn't whether he received the money, it's whether he directed it. My note, Your Honor, is that Defendant Barkas did direct those monies, and bear with me for just a moment. What I gather your argument is that even if Lombardo didn't direct it, if that citation doesn't corroborate that argument, that his receipt of the money is sufficient. Yes, Your Honor, and as I argued in closing. Now, Ms. Copeland is basically arguing that this is just a good old boy that has lots of problems, and he's trying to help sell these various investments or products. When you say that he received monies for his personal use, was there a tie in the case between getting reimbursed, say, for his travel to sell these different things, versus other simply payments that weren't tied to services? Yes, Your Honor, there was a substantial amount of money, approximately 50% of the money that came in from investors, and many of the witnesses that the government put on believed themselves to be investors, not lenders. There is roughly a 50-50 split in the disbursement of those monies that are separate and apart from any business expenses, Your Honor. It's about $2 million total, isn't it? Yes, Your Honor. About a million for each of them. That's correct. The jury would have to believe, to agree with Ms. Copeland's characterization of this, the jury would have to believe that Lombardo actually put in a million dollars worth of efforts into this for which he's being reimbursed. Correct, and the jury would also have to discount the testimony of Victor Rothgarn, who provided approximately $100,000, as Judge Seiler pointed out, got $20,000 back, and Mr. Rothgarn, or excuse me, defendant Lombardo was the face of that exchange between himself and Mr. Rothgarn. But what did Rothgarn say he had been told? He had been told, Your Honor, that the Orasooth business was a sure thing and that statement was made to him by defendant Lombardo. Okay, but we don't send people to jail for enthusiastically selling an investment. Correct. We only do it when, and we don't do it when the person's puffing. You need to show that there never was an intent to pursue this business venture. Well, that would be correct, Your Honor. There was a minimal amount of money that was used to make a first batch of bottles. I know that you were asking Ms. Copeland what efforts were taken with respect to Orasooth. The record will reflect that there was a minimal effort to have an initial production of this ointment that was used for psoriasis. But what the government does have to show, which Your Honor is pointing out, is that the vast majority of that money was not used for a business purpose. Mr. Rothgarn believed that he was putting money, his money was going toward a business purpose, and that all the money was going to be used for that purpose. Can you tell us even in general terms how much money was raised in connection with that business and how much money does the government claim was actually used, how much of the investment was actually used to make the product? I would say it was a small percentage, Your Honor. I don't want to speculate and give you a number. What I can tell the court is that there was an initial production of these bottles, that the bottles were placed in a fulfillment center, but very shortly after the bottles were placed there to be sold, the fulfillment center refused to disperse the monies because Barcus and Lombardo fell into arrears with the fulfillment center and 99% of the bottles that were produced were never actually sold. What was a fulfillment center? Your Honor, a fulfillment center is used when a customer, upon receiving some type of advertisement, wants to order the ointment. So rather than Barcus and Lombardo handling the orders themselves, though they would make a call, the fulfillment center would take the order, take the money, take a percentage of the money, and ship it out. Like a mail order place. Yes, Your Honor. That's exactly correct. So they didn't fulfill any of the orders because Lombardo and Barcus were in breach? That's correct. There were a few orders fulfilled, but the vast majority of that first skid that was prepared was not sent out because Barcus and Lombardo fell into arrears with respect to paying the fulfillment center. So apparently their claim is that happened just because it was a bad business. Things didn't go well. Your claim is they never had any intention of doing that. Correct. So what corroborates your claim? It would be the disbursement of the money. Getting back to Judge White's question, she's exactly correct. Puffing is not a crime. Bad business decisions are not a crime. But when you tell an investor that the money is going to go toward the marketing of the product and the lion's share of the money goes directly to the defendants to pay their personal expenses, that is a crime. That is fraud. We also have, with respect to Mr. Rothgaard, the sale of an unregistered security as part of Count 5. I know it's raised that there was insufficient evidence of securities fraud. That wasn't registered. That was sold. Was Rothgaard the only investor who testified who had bought the securities about the... Yes, Your Honor. Yes, Your Honor. The government also argued, and the jury apparently agreed, that some of the promissory notes that were signed served as securities as well. Now the other issue I would like to address would be the plea agreement. There was a lot of discussion early on during Defendant Barkas' presentation regarding the plea agreement. The record will reflect that early on during my direct examination of Mr. Helfcott, the plea agreement was discussed. I would also like to correct that Mr. Helfcott was initially discovered as a target in an unrelated case. However, a review of his bank accounts revealed the activity that gave rise to this investigation. Mr. Helfcott pled guilty to a supplemental information that was filed in that case. That supplemental information was detailed, and it did serve as the basis of the charges that eventually issued as to Barkas and Lombardo. Defendant Helfcott received an additional two-level enhancement for entering a guilty plea to the supplemental information. Now, it's been stated in the briefing that the plea agreement was used as a bludgeon and that the plea agreement somehow took over this scripted exchange between myself and Mr. Helfcott. I would cite the court to Mr. Helfcott's two days of testimony, of which the plea agreement discussion was a small part. The government took painstaking time going through all these transactions, talking about how Mr. Barkas directed Helfcott throughout this entire conspiracy. And I would cite this court to the case U.S. v. Christian, where there's substantive testimony of the underlying offense that's over and above what's in the plea agreement. I know, Judge White, you had talked about that the government could have just simply put out the plea agreement and sat down. That's not what happened. The record does not show that. What the record shows is an initial discussion of the plea agreement and a detailed discussion about this entire conspiracy. Furthermore, with respect to using the plea agreement on redirect examination, it's the government's submission that, obviously, Mr. Helfcott's testimony, his credibility had been challenged. And as a result, the plea agreement was used as a prior consistent statement to rehabilitate him on redirect. His plea agreement was not submitted as substantive evidence. It was submitted- Was that the only time during the sequence of testimony that you went over the plea agreement? Factual assertions, paragraph by paragraph? That would be initially, Your Honor, during direct examination. I focused Mr. Helfcott on portions of the plea agreement on redirect after his credibility had been challenged. Was there objection at the time by defense counsel? No, Your Honor. No, that did not come in. So with respect to the evidence presented by Mr. Helfcott, he not only established the fraud component of the case, he also established the tax component of the case. Well, didn't he deny knowing? Your Honor, I believe that Your Honor is referencing the memorandum of interview that was set forth. He suggested using the IOLTA account, right? He did. Okay, so he says, I'll handle your money. What was he doing? What does he claim he was doing? Initially, Mr. Helfcott testified that he was using it to assist Mr. Barkas to hide money from his creditors, to hide money from Barkas' creditors. As the conspiracy continued, Mr. Helfcott testified that he became aware as a result of conversations with Barkas that Barkas and Lombardo had tax issues with the IRS. He further testified, as noted in the government's brief, that using the IOLTA account and using the PCF account would frustrate the IRS's ability to not only seek payment as part of the evasion of payment, the one object in count six, but also to evade assessment for the ongoing conspiracy going from 2001 to 2006. I'd like to ask you something else. It does seem to me that there were many times when Barkas was trying to introduce state-of-mind evidence. Yes. And he kept getting cut off on it. Yes. And so if you're trying to figure out whether when he took the money what his intent was, it seems to be relevant what people were telling him, what he was trying to do, etc. So why was this evidence not admissible? Why was the tax advice not admissible? It was not admissible, Your Honor, because it did not comport with the provisions of 8033 for present sense impression. That's what was argued in Appellant's brief with respect to the admissibility. I objected based on the fact that it was hearsay. But Mr. Barkas was trying to say what other people told him. Right. And so it was the government's view that that constituted hearsay. But it's not hearsay. Well, it's the government's position that it is hearsay. It's not hearsay. If somebody says to me, this is perfectly legal, it's not being offered for the truth that it's perfectly legal. It's being offered for the fact that somebody in a position with knowledge, presumably, told me it was perfectly legal. So you're looking to the truth of the person on the stand, that somebody, in fact, said this to me, not whether that statement was true. Well, the example Your Honor gave was a conclusion. 8033 states that it's a statement of the declarant's then-existing state of mind, mode of intent or plan, emotional or sensory or physical condition. What Mr. Barkas wanted to do was that to talk about... No, no, no, no, no. That's a hearsay exception. This is not hearsay. It's not being offered for the truth. When somebody says, somebody said this to me, that's the assertion that the jury has to believe. Whether it's true or not is not relevant. I understand. So it's not hearsay. You're not looking for a hearsay exception. It's not hearsay. What was the government's position as to whether what he was or wasn't told after these sales was relevant to the element of the crime? Well, it's not, Your Honor. What is relevant to the element of the crime is what he told the investors. Were any of these things that he wanted to put in either contemporaneous with what he told the investors or prior to what he told the investors so as to allow him to argue, I talked to my lawyer, he said it's legal, so this is what I did? Or were they all after the fact? Well, with Defendant Barkas, he was all over the place, Your Honor. It wasn't quite that clear. So some might have been after the fact of some sales but prior to other sales. Correct, because we have a long time period. And Mr. Barkas did take the stand and deny culpability. He did have his opportunity to take the stand and say that none of us got repaid. He did state that he had every intention of paying these people back, Your Honor, and that didn't happen. We have witness after witness, with the exception of Mr. Rothgard, that came in and talked about how they were told that they gave this money to Barkas for a business purpose and the evidence we put on with respect to the bank records show that that's not what happened. And Barkas's conclusion was that none of us got paid. Well, he did get paid. He put the money in his pocket and he lived on it. He evaded the IRS. He evaded assessment with respect to that money. With respect to some of the other issues that were raised, with respect to the theory of duplicity by Defendant Barkas, the government would submit that that should be reviewed as plain error and that's easily rejected because Counts 1 and 6 had separate objects and separate elements. With respect to the multiplicity issue and the material variance raised by Defendant Lombardo, the government would then ask the court to rely on the testimony of Barkas, which talked about how he evaded assessment, he evaded payment, based on the wiring instructions and the other activity that we had talked about. And why was the negotiations with the IRS not fair testimony? Well, I'm sorry, Your Honor, I'm not sure. Maybe I misunderstand what it was that he wanted to introduce, but was there a period of time where someone was negotiating with the IRS for Barkas? Yes, based on the investigation. I'm not sure that that's in the record, but I have knowledge of that based on the investigation. Is that what he was trying to get in? Well, I think what he was trying to get in is his, and I have the list in front of me, Your Honor, the points that Defendant Barkas raises first is the pre-indictment negotiations with the government. As noted in the government's brief, that simply wasn't relevant under Evidence Rule 402. And not only that, but Barkas denied any wrongdoing in front of the jury, so he had his opportunity. The other issue were the third-party statements regarding the legal and tax advice that we just discussed a moment ago. The other issue, Your Honor, which I think you might be thinking of, is the purported or the theory of reclassification of the monies coming in as loans to income. I'm not sure if that's what you're, Your Honor, speaking of. The government would raise several points in response. Barkas did testify about the IRS lack of notice. He did testify to that on direct examination. Barkas knew of the assessment. He knew of the money owed. There was nothing more proffered. I know Judge Seiler mentioned that in some earlier questions. There was nothing proffered by defense counsel on that issue. And the government's position at trial and here today is that the IRS was not aware of this money. This money that came from investors either went into the IOLTA account or the PCF account. So how would the IRS be in a position to reclassify when it was unaware of the money? This money was never directed into an account that was in the name of Barkas and Lombardo. And Barkas characterized this money, as the record reflects, as personal loans for a business purpose. Well, all those monies went into nominee accounts. And that's the essence of this case. That's the essence of the fraud. Unless there's any other issue the panel would like to raise with me. We went way over Mr. Barkas's allotted time because the panel had a lot of questions of Mr. Belli. Is there anything that you need more time to address or are you satisfied? Your Honor, there is one final point I'd like to make, and I appreciate the opportunity. I would ask the court, having re-read it last night, to look at Thornton. I know that there was an argument earlier during our discussion about Thornton being applied in this matter. And as argued in Defendant Barkas's brief, there's nothing in that opinion that is limited to the proper or limited as to the way in which a plea agreement is used. It's characterized on page 12 of Mr. Barkas's reply brief about considerable restraint. That language is not in the Thornton opinion. Under Thornton, under Christian, the plea agreement was properly used in this case. Thank you, Your Honor. One quick question. Your theory was that all this money that they were getting was income? Yes. Yes. For them. Right. And the IRS could not assess because there were no taxes paid and they were unaware of it. Thank you. Thank you. Mr. Belli? Am I saying that correctly? Yes. I'll be very quick. Judge McKee, you asked about the time frame of these statements that were made to Mr. Barkas by tax professionals, accountants, et cetera. Many of these statements began in the 1990s and continued into the time frame of the indictment. I'm not aware of any statements that he was trying to get in after the 2006 alleged ending date of the conspiracy. Trying to figure out what he wanted to put in, I mean, it seems to me it comes down to whether the auto dialers were leases or securities, tax consequences of an SEC consent decree, statements by an IRS revenue officer during a 1993 audit, and legal advice about creating trust for the timber top interests. Is that a fair summary? Yes. I'm having trouble understanding why any of that is relevant to at least the two conspiracy charges here, the false statements in connection with the sale of investments and the conspiracy to avoid paying income taxes. What do any of those have to do with that? Well, we submit that certainly it's relevant to the tax fraud conspiracy because everything comes down to the defendant's intent and knowledge. And Mr. Barkas stated he was not aware of a tax lien and he had fought the SEC and the IRS whenever they contacted him and retained professionals to address those situations. So we do think that it would be relevant to the question of intent. Was there any evidence that he had actually revealed all the facts necessary for these professionals to give a valid opinion? Well, he wasn't permitted to develop a record in this regard, so... Well, that's the purpose of a proffer, which seems to me to have come too late. But assuming that it's timely in a motion for a new trial, did he speak to that in that? Well, the motion for a new trial does contain an extensive... There are statements from the professionals in question that are attached, and I believe that they went into depth, but I think they did understand the nature of the situation. I mean, I suppose those documents speak for themselves. All right, we'll look. And one other point, Your Honor. On page 17 of my brief, we quote this memorandum of interview conducted about a week before the jury trial, and Mr. Helfgott told the AUSA and the case agent that he, quote, did not know Barkas was attempting to hide funds from the IRS, unquote. No qualifications whatsoever, and then in trial, faced with a contrary statement in the plea agreement, he starts hedging. So we think that our characterization of the plea agreement as a bludgeon is accurate. And one more point, page 7457, 7458 of the trial transcript. Mr. Helfgott was asked about these negotiations to sell the Orsu business, and he says, I did believe there was a viable transaction here. And the defense counsel asks, okay, you didn't think these were just fake transactions? No, everything points to Mr. Helfgott thinking that everything is legitimate. Is it an unfair characterization that only a small amount of the money that was raised in connection with that product was actually invested in producing the product? I recall – Producing or selling the product? Well, there were witnesses called by the government regarding the manufacture of the product, the negotiations with the fulfillment center to send out the product, but it was never quantified in terms of exact dollars, but the testimony is there. Thank you. Wait, wait, one last question. So what do you claim the money was for that he got, the million dollars? What was that? Most of the money was personal loans. These individuals were never told, other than like Mr. Rothgarn, and I think there was another individual, they were never told this money is specifically allocated toward this business. Personal loans to Lombardo? No, to Mr. Barkas. Mr. Barkas? Yeah. Loans not of these people, but loans of – okay, people didn't give him money saying this is a personal loan, right? No, it was Mr. Barkas's position that that was the case, and some of the witnesses admitted that, but then said, well, but they thought something differently, and others, you know, claimed, oh, we thought it was for business purposes, so the testimony is all over the place. But there were witnesses who said we gave him money for business purposes, right? No, they assumed that it would be used for business purposes, but Mr. Barkas said that these were personal loans. You're saying that nobody testified that money was given to Barkas for business purposes? They assumed. Some individuals assumed. Was there any testimony about representations that led them to assume that? There were numerous individuals. I mean, because, counsel, what you're saying is that there's insufficient evidence, that people gave him money for loans, he never told anybody it was for anything but a loan, and he used it as a loan. Well, that's our position. The government is saying that, circumstantially, the evidence points otherwise, and that's why this case is so difficult, because it involves a state of mind. But, no, Mr. Barkas testified he was clear that these were personal loans. Some money he would plow back into business expenses. Others were for Mr. Okay, so his view is that these were all personal loans. My intent was to use it as personal loans and also to use it at my option for business so that I could eventually pay back the personal loans. Yes. Okay. But you do acknowledge that there was some testimony, at least, that he led people to believe that they were business loans? Some individuals testified that that's what they assumed. One individual got an equity interest in the company. That's true, and that's Mr. Rothgarn, and that is an exception. Those negotiations were an interest in or a suit, and he did get his certificate for that interest, yes. All right. Thank you. Ms. Copeland, you had a couple minutes left as well. Thank you, Your Honor. Just briefly, turning to exactly what Mr. Rothgarn said, you had asked about that earlier. It's interesting. At the first volume of Mr. Rothgarn's deposition, at pages 9 to 10, he testifies they had a conversation with Mr. Lombardo how to invest money, and Mr. Lombardo first told him to keep it in the bank. Later on, there were some discussions about RSU, though, and, again, Mr. Rothgarn believed in the product, had somebody who found it very effective. There is some testimony from Mr. Rothgarn at pages 66 to 67, as the government notes, that Lombardo said this was a, quote, for sure thing. But, again, Mr. Rothgarn did get an ownership interest. I think it's very interesting. At pages 125 to 126 of the second volume of Mr. Rothgarn's deposition testimony, he testifies that he put no limits on these defendants how to spend money. He knew that there would be administrative expenses. He didn't say, I'm giving you this money to make an additional 10,000 bottles of RSU. He gave it to them to run a business. And, again, the testimony that I cited to you earlier at 128 to 129, that this was for an investment. He made a business decision, and he simply wasn't happy with the results. Turning to the testimony of Gregory Kent at the fulfillment center that the government mentioned earlier, and that's in volume eight of the trial transcripts at page 1504 of the transcripts, there was an order of about five pallets that was initially delivered to the fulfillment center. This was a couple thousand bottles of RSU. This occurred in March of 2004. Interestingly, like many of these other witnesses, Mr. Kent had nothing to do with Mr. Lombardo. At one point, he says he inquired with Mr. Barkas about an order that needed to ship, but, quote, zero, pretty much nothing, close quote, by way of any correspondence or any contact with Mr. Lombardo. So Mr. Kent, the fulfillment center's testimony is that he dealt with Mr. Barkas, who apparently didn't pay the bills. During this time, there's also testimony that Mr. Barkas was in discussions with a strategic development group and other entities trying to sell RSU because it was a good product. There was some testimony even that there was a hoped-for deal with the art of the art for $15 million to pay back all the investors and sell RSU, but I'm not sure that that ever came to – that didn't come to fruition. Harry Berg, who testified at trial via video deposition at pages 3597 to 99 of the trial transcript, testified that Mr. Lombardo didn't misstate anything to him and owes him no money, and he didn't ask him to do anything illegal. And Mr. Berg, in exchange for giving up the recipe, if you will, for RSU, did receive an equity interest in it. As for whether there were expenses that were paid, sure. Helfgott talks about them in his testimony. I tried to find in my notes exactly where. I apologize for not being able to do it. I think the best example may be with Timber Top. You can look at the testimony of Quigley and the testimony immediately before that of the Mount Shasta title examiners, where they talk about submitting claims for expenses. Timber Top, what percentage of the money that your client received would you say was fairly characterized by the evidence as reimbursing him for things that he did to promote these various enterprises versus simply money that isn't tied to his efforts on behalf of these investments? Your Honor, I wish I could answer that question. I simply do not know from reading the trial transcript. I will tell you this, because you'd ask me. Is it reasonable for a jury to conclude that even though some of those reimbursements were for investment, for business efforts, that he got a lot of other money that didn't seem to be tied to his efforts on behalf of these companies? Was that a reasonable conclusion if that's what the jury reached? Absolutely not, Your Honor. We talk about this $2 million loss or whatever. I went back while I was listening and had it in my ear. In the PSI, and ultimately at the sentencing hearing at about pages 87 to 88 and 96, the judge sets the loss amount. This was the total loss amount at $908,000 for both defendants. This is the amount of loss. If you look at it and if you count 2000 to 2006 as seven years, if you count them each as a year rather than just subtracting, Mr. Lombardo, if you half $908,000 down the middle, we're talking $454,000. That's a lot of money. Over seven years, we're looking at somebody making roughly $70,000 a year. All the testimony from the witnesses at trial is that Mr. Lombardo is out there trying to sell this stuff. He's going up to Timber Top in northern California. He's dealing with permitting issues. He's trying to find a kiln. He's trying to find a sawmill. He's trying to get it up and running. About Arasu, there's testimony that he's flying his plane to the National Psoriasis Foundation conferences over the country. He's taking the product. He's preaching the gospel of Arasu, and these are simply failed business deals. So if you look at it, rather than in terms of a $2 million windfall to Mr. Lombardo, but as a man who is working in these businesses making roughly $70,000 a year in the 2000s, then this is not a hand over fist living. He's not raking in fat stacks of cash. If you have any more questions, I'd be happy to answer them. All right. Thank you. Thank you. Thank you, counsel. The court notes that both Mr. Belli and Ms. Copeland were appointed under the Civil Justice Act. You've really done an exemplary job on behalf of your clients. The court thanks you on your clients' behalf and on our behalf, too, to try to sort out this case. Thank you. Thank you.